**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

PATRICIA C. HEARD,

      Plaintiff,

        v.

FIELD CORE,

      Defendant.

Case No. 1:23-cv-527

JUDGE DOUGLAS R. COLE
Magistrate Judge Bowman

## OPINION AND ORDER

Complaints proceed on allegations, but parties win or lose the cases themselves based on *evidence*, which parties typically obtain through investigation and discovery. That paradigm presents something of a problem for Plaintiff Patricia Heard here. She alleges that Defendant FieldCore Service Solutions, LLC (FieldCore)[1] discriminated against her on various grounds when it terminated her employment. But in response to FieldCore's recent motion for summary judgment, she provides little actual evidence to that effect. Accordingly, as more fully explained below, the Court **GRANTS** FieldCore's Motion for Summary Judgment (Doc. 36).

## BACKGROUND

Heard formerly worked as a tooling consultant for FieldCore. (Heard Dep., Doc. 36-3, #150). FieldCore's business is to "repair, upgrade, and maintain power

---

[1] Although Heard styled the defendant in her Complaint as "Field Core," the Defendant instead refers to itself in its filings as "FieldCore," or in full "FieldCore Service Solutions, LLC." (*See e.g.*, Ans., Doc. 6; Def.'s Mot. for Summ. J., Doc. 36). Accordingly, the Court refers to the Defendant as FieldCore in this opinion and order.

generation facilities" across the world. (Doc. 36, #97–98). To accomplish those ends, it sends field workers out to perform requested repair or maintenance jobs, and it supplies these workers with the necessary tools and equipment via shipping containers. (*Id.*). These shipping containers are large metal boxes, on the order of ten or twenty feet long. (Doc. 36-3, #160–61). As a tooling consultant, Heard packed these shipping containers at "tool centers" that FieldCore operated. (Doc. 36, #98). Specifically, her job was to secure within the shipping containers the various tools, cables, and other equipment for which a given job called. (*See, e.g.*, *id.* at #98, 102). She also unpacked, cleaned, and took inventory of the shipping containers upon their return. (Doc. 36-3, #151–55).

Heard began working at FieldCore as a temporary employee staffed through Mars IT. (*Id.* at #147). In September 2021, though, FieldCore hired Heard as a full-time employee. (*Id.*) She remained there until she resigned on April 29, 2022. (*Id.* at #143; Doc. 39-1, #314 (e-mail dated Apr. 29, 2022, stating "I will not be back on Monday or any other day")).

While Heard nominally resigned on that day, she says that she did so only due to various forms of discrimination that she experienced at FieldCore. Heard is an African American woman and lesbian. (Doc. 39, #293). She claims that, as a result, she was subject to (1) discrimination, based on FieldCore creating a hostile work environment and constructively discharging her, and (2) retaliation in various forms (for reporting the incidents underlying the discrimination). Her Complaint alleges, for example, that she was "harassed and insulted by other employees," "discriminated

against … based on [her] sexuality," and even received a "threat against [her] life and [her] son's life." (Pl.'s Compl., Doc. 3, #16–17). Although not explicitly listed in her Complaint (she is proceeding pro se, and her Complaint is not the model of clarity), these allegations appear to arise from six main incidents that she says happened at work: (1) a coworker drugging her tea, (Doc. 36-3, #198–99); (2) a coworker using racist sign language towards her, (*id.* at #211–12); (3) coworkers spraying her with deer "estrus" to make her smell bad,[2] (*id.* at #202–03); (4) two coworkers following her to the hotel where she lived, (*id.* at #217–19); (5) a coworker negatively discussing her sexuality, (*id.* at #187–89); and (6) coworkers putting a noose in a shipping container she was assigned to unpack, (*id.* at #158–65).[3]

---

[2] Deer "estrus" is more typically referred to as "deer spray." It is made from the urine of a doe in heat and has a pungent odor. Deer hunters use it to attract bucks to the hunter's location. *See e.g., Wildlife Research Center Doe-in-Estrus Deer Attractant*, Bass Pro Shops, https://www.basspro.com/p/wildlife-research-center-doe-in-estrus-deer-attractant [https://perma.cc/E6CG-9RRF].

[3] Heard raises two new factual allegations in her Response to Defendant's Motion for Summary Judgment. (Doc. 39, #291). However, the Court cannot consider these allegations. That is true for three reasons. First, when evaluating a motion for summary judgment, the Court can consider "materials in the record," such as affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(a). Heard's Response does not qualify as an opposing affidavit though because it was not signed under penalty of perjury. *See Belser v. James*, No. 16-2578, 2017 WL 5479595, at *2 (6th Cir. June 6, 2017) ("Each of Belser's pleadings was signed under penalty of perjury, and is therefore sufficient to qualify as an affidavit for the purposes of summary judgment." (cleaned up)). Second, even if her brief could qualify as an affidavit, a nonmoving party cannot create a dispute for purposes of summary judgment by filing an affidavit that directly contradicts the party's earlier deposition testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). If the court finds the affidavit directly contradicts the party's deposition testimony, then the contradictory portions should be stricken unless the party provides a persuasive justification. *Aerel*, 448 F.3d at 908. At Heard's deposition, FieldCore's counsel directly asked, "Is there anything yet that we haven't talked about that is relevant … to your lawsuit?" (Doc. 36-3, #239). Heard responded that she put all her allegations in her paperwork or discussed them in the deposition. (*Id.*). By raising new factual allegations in her Response, (Doc. 39, #291), Heard directly contradicts her deposition testimony that she discussed all incidents underlying her claims. She does not provide a justification, let alone a persuasive one, for

The last incident—involving the noose—was the final straw that culminated in Heard's departure from her employ at FieldCore. (*Id.*). On April 19, 2022, Heard was randomly assigned a shipping container to unpack. That was not in and of itself unusual; unpacking shipping containers was part of her normal job responsibilities. (*Id.* at #157, 160). But after moving several large items out of the container, which required a forklift, Heard reports she saw two "air horns" hanging on a rope in the corner of the container. (*Id.* at #161–62). To her, the setup of the air horns resembled a noose because the air horns were black and strung up by a rope tied with a slip knot. (*Id.* at #163–64). She viewed this not only as a threat to her life, but also as a threat against her nine-year-old son's life because there was a smaller air horn tucked inside the larger one (ostensibly representing her and her son). (*Id.* at #179–81). Heard took photos of the dangling air horns and asked several other employees whether it seemed threatening. (*Id.* at #165, 170–75; Doc. 36, #102 (attaching Heard's photos)). The Court attaches one such photo here:

---

why she omitted these allegations previously. Third, she is seeking to add new evidence after the close of discovery. The Court entered a Calendar Order in this case. Under that Order, discovery closed on June 1, 2024. (3/13/24 Not. Order). If Heard wanted to supplement any earlier-provided discovery responses, she was required to do so before that date. For each of these three independent reasons, the Court cannot consider, or elects not to consider (to the extent the Court would have the discretion to do so), these new factual allegations.



(Doc. 36, #102). The nested "air horns" are the black tube in the corner of the container along with the silver tube resting inside it. As the photo depicts, they are indeed fastened to the side of the container, hanging off of the ground, and suspended by a slip knot.

Beyond raising the incident with her co-workers, Heard also reported it to Ryan King, the plant manager. (Doc. 36-3, #175). King proceeded to investigate the container and review video footage of the facility. (*Id.*). King informed Heard that, based on his review of the video footage, he did not see anyone else entering the shipping container. (*Id.* at #175–76). In other words, he concluded the air horns were secured in that manner in the field before the container was shipped back to the plant

for unpacking (and of course those field workers could not know who would be assigned to do the unpacking). (Doc. 36-10, #264).

Unsatisfied with the investigation, Heard emailed the following morning that she was using all three of her vacation days because she "no longer fe[lt] safe at work," but that she would return on Monday, April 25.[4] (Doc. 39-1, #311–12). When she did not come to work that Monday, her supervisor reached out to her about returning, but she did not show up the rest of the week either. (*Id.* at #313–14). Over the next few days, Heard repeated her beliefs that the workplace was not safe for her to return to a human resources manager and two supervisors, and emailed "[n]ot a letter of resignation" on Thursday, April 28. (*Id.* at #314). Finally, a FieldCore human resources manager called Heard on Friday, April 29, informing her that FieldCore had formally closed the investigation, and that if she failed to return to work the following Monday, FieldCore would treat that as her resignation. (Doc. 36-13, #284). After the call, she emailed "I will not be back on Monday or any other day." (Doc. 39-1, #314). Upon receiving the email, FieldCore treated that Friday as the end of Heard's employment, due to job abandonment. (Doc. 36-1, #116).

Heard responded in two ways. First, it appears she filed a charge with the EEOC. (Doc. 39-3, #339–40 (addressed to EEOC); Doc. 39-4, #345 (same)). Then, after the EEOC apparently issued a right to sue letter, she sued. Proceeding pro se, she

---

[4] In Heard's deposition, she claims the noose incident occurred on April 26. (Doc. 36-3, #158). Based on the emails exchanged between Heard and FieldCore, the incident seems to have occurred on Tuesday, April 19. (Doc. 39-1, #311). Therefore, she would be reporting back to work on Monday, April 25.

completed a court-provided form for pro se litigants to use to prepare complaints under 42 U.S.C. § 2000e-5(f)(1).[5] (Doc. 3). Under the Statement of Claim section, the form quotes the beginning of Title VII, which prohibits employers from discriminating, 42 U.S.C. § 2000e-2(a)(1), and then it provided a space for Heard to include a brief handwritten paragraph containing her factual allegations related to any such discrimination, which Heard did. (Doc. 3 at #16–17). She then signed the Complaint under penalty of perjury. (*Id*. at #17).

Fast forward two years. FieldCore now moves for summary judgment on all of Heard's claims. (Doc. 36). FieldCore argues that, before this lawsuit, it investigated each of the incidents about which Heard now complains, but says it could not substantiate any of them. (*Id*. at #99–106). It also argues that since she filed her Complaint, Heard has "deposed no witnesses, collected no statements, and requested no documents from FieldCore or any third party." (*Id*. at #107).[6] FieldCore contends

---

[5] The Court equivocates on whether Heard filed with the EEOC or received a right-to-sue letter for the following reason: the form she used to prepare her Complaint instructs plaintiffs to "attach a copy of the charge you filed with the Ohio Civil Rights Commission and/or the Equal Employment Opportunity Commission," and attach a copy of the notice of the right to sue. (Doc. 3, #15–16). While Heard states she received a notice of the right to sue on July 12, 2023, (*id*. at #16), she did not attach a copy of either document to her Complaint. The only related documents she filed are a letter containing a "Charging Party Response Position Statement" and FieldCore's "Employer Position Statement," both addressed to the EEOC, as exhibits to her Response to Defendant's Motion for Summary Judgment. (Doc. 39-3; Doc. 39-4).

[6] Heard technically did attempt to obtain video footage in a Motion to Reopen Discovery, (Doc. 27, #66), and she later filed a request for production of documents and interrogatories in her Reply to FieldCore's opposition to the motion, (Doc. 30, #80–85). The Magistrate Judge denied her motion, though, because Heard filed it over five months after the close of discovery. (Order, Doc. 31, #86–87). Before that motion, Heard "made no effort to conduct any discovery at any point." (*Id*. at #86). Heard did not object in this Court to the Magistrate Judge's Order denying her motion.

that, because she has not collected any evidence, she cannot establish a prima facie case of race- or sex-based discrimination. (*Id.* at #111–12). Rather, the record evidence shows that Heard's employment ended due to her abandoning her job when she failed to return to work after exhausting her vacation days. (*Id.* at #97, 105–106). Similarly, FieldCore argues Heard's claims regarding a hostile work environment and retaliation must be dismissed for lack of evidence. (*Id.* at #112–14).

Heard responded, (Doc. 39), and FieldCore replied, (Doc. 41), so the matter is ripe for the Court's review. And as things stand, the sum total of the record evidence before the Court is (1) the allegations in Heard's Complaint (which count as evidence, given that she signed it under penalty of perjury), (2) the evidentiary materials that FieldCore attached to its motion for summary judgment, and (3) four exhibits that she attaches to her opposition to the motion for summary judgment.[7] That's it.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the

---

[7] The exhibits consist of: (1) various email exchanges between Heard and FieldCore regarding her resignation, (Doc. 39-1); (2) her application for unemployment benefits, (Doc. 39-2); (3) her charging party response position statement, filed with the EEOC, (Doc. 39-3); and (4) FieldCore's corresponding employer position statement to the EEOC, (Doc. 39-4). While she does not authenticate the materials by way of an affidavit, given that she is proceeding pro se, along with FieldCore not disputing the authenticity of the documents, the Court will consider the exhibits for purposes of deciding the summary judgment motion.

movant meets its burden, though, the nonmoving party may not rest on its pleadings, but rather must come forward with significant probative evidence to support its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347. A party must support any assertions with evidence such as depositions, documents, affidavits, or other admissible evidence (or at the very least citing material that could "be presented in a form that would be admissible in evidence"). Fed. R. Civ. P. 56(c)(1), (2). If there is "[a] complete failure of proof concerning an essential element of the nonmoving party's case," then the Court will treat "all other facts [as] immaterial." *Celotex,* 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). And in making that determination, the Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

Heard is a pro se plaintiff, and pro se pleadings are to be construed liberally and are subject to less stringent standards than formal pleadings filed by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Franklin v. Rose*, 765 F.2d 82, 84–85 (6th Cir. 1985). But "[t]he liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment

stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted).

## LAW AND ANALYSIS

Because FieldCore requests summary judgment, the necessary first step is determining what claims Heard is pressing. Usually the Complaint answers that question. But that is not so much the case here. Heard's Complaint is remarkably vague as to her specific claims. Read in the light most favorable to her, though, it appears she may be alleging (1) discrimination, either based on a hostile work environment or because FieldCore constructively discharged her, and (2) retaliation, both of which violate Title VII. So that is how the Court will treat her claims (as did FieldCore in its motion).

The shortcoming as to each, FieldCore says, is that Heard has produced no evidence beyond her own testimony to support either of these claims. (*See generally* Doc. 36). The Court largely agrees with that assessment. And that is a problem for Heard, as her testimony, even coupled with those alleged facts as to which she has managed to create a dispute, fails to create a genuine dispute as to any *material* fact. To show why, the Court addresses the claims by category, starting with her discrimination claims, under both a hostile-work-environment theory and a constructive-discharge theory, and then ending with her retaliation claims.

A. **FieldCore is Entitled to Summary Judgment on Heard's Race and Sex Discrimination Claims Because Heard Cannot Establish a Direct or Circumstantial Case of Such Discrimination.**

Title VII prohibits an employer from discriminating against an individual because of the individual's race or sex (including sexual orientation). 42 U.S.C. § 2000e-2. To prevail on a discrimination claim, Heard ultimately must provide either direct or circumstantial evidence from which a jury could conclude that FieldCore imposed an adverse employment action on Heard based on animus directed at Heard's race or sex. *Talley v. Bravo Pitino Rest., Ltd.,* 61 F.3d 1241, 1246 (6th Cir. 1995) (first citing *Terbovitz v. Fiscal Ct.*, 825 F.2d 111, 114–15 (6th Cir. 1987); and then citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Circumstantial evidence, by contrast, is evidence from which a jury could reasonably infer that such unlawful discrimination occurred. *Kyle-Eiland v. Neff*, 408 F. App'x 933, 939–40 (6th Cir. 2011). Importantly, though, direct evidence and circumstantial evidence are merely "different evidentiary paths" by which a plaintiff can show the employer's motive for an adverse employment action against the plaintiff. *Terbovitz*, 825 F.2d at 115. In other words, under either theory the plaintiff still must show that he or she suffered an adverse employment action. *See e.g., Brister v. Michigan Bell Tel. Co.*, 705 F. App'x 356, 359 (6th Cir. 2017) (noting that the plaintiff has a "fundamental burden" to establish she was constructively discharged regardless of whether the plaintiff relied on direct or circumstantial evidence). Here, whether

treated as a direct- or circumstantial-evidence case, Heard's claim fails for the simple reason that she cannot create even a genuine dispute as to whether FieldCore took an adverse employment action against her.

"An adverse employment action is 'a materially adverse change in the terms and conditions of [a plaintiff's] employment.'" *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 607 (6th Cir. 2019) (quoting *Spees v James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010)). Examples include "'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (citation and quotation omitted). But here, the undisputed facts show that FieldCore did not demote, reassign, or terminate Heard. Rather, Heard resigned. And resignations are not adverse employment actions. *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 2012 WL 3104508, at *5 (6th Cir. 2012) (Table). So, unless she has something more, she cannot avoid summary judgment.

Heard resists that conclusion, arguably in two ways.[8] First, she seems to suggest that the working conditions caused by the discrimination were so intolerable that those working conditions themselves constituted an adverse employment action. Courts typically refer to this as a hostile-work-environment claim. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993). Alternatively, she could be understood as arguing that those same working conditions actually forced her to quit—that her "resignation" was not voluntary. Courts call this a constructive-discharge theory. *See*

---

[8] Again, neither her Complaint nor her brief are models of clarity. Given her pro se status, though, the Court gives the most generous read that it can to both.

*Green v. Brennan*, 578 U.S. 547, 555 (2016). As described below, though, Heard is unable to proceed past summary judgment based on either of these theories.

### 1. Heard Cannot Establish a Prima Facie Case for a Hostile Work Environment.

"Title VII offers employees protection from a workplace permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Barrett v. Whirlpool Corp.,* 556 F.3d 502, 514 (6th Cir. 2009) (citing *Harris*, 510 U.S. at 21) (cleaned up). But the "severe or pervasive" part of that matters. The law is settled that isolated incidents are not enough to allow a plaintiff to move past summary judgment on a hostile-work-environment theory. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). And here, even when read in the light most favorable to Heard, isolated incidents are all the record even arguably shows.

As noted, Heard offers six instances of allegedly discriminatory conduct. But as to three of the six, she cannot even create a genuine dispute that the incidents in fact happened. And as to the remaining three, where her testimony perhaps suffices to create a genuine dispute that they occurred, the incidents are not sufficiently "severe or pervasive to alter the conditions of employment." Recall the six alleged instances of unwelcome racial or sexual harassment that Heard identified: (1) a coworker drugging her tea, (Doc. 36-3, #198–99); (2) a coworker using racist sign language, (*id.* at #211–12); (3) coworkers spraying her with deer "estrus" to make her smell bad, (*id.* at #202–3); (4) two coworkers following her to the hotel where she lived, (*id.* at #217–19); (5) a coworker negatively discussing her sexuality, (*id.* at

13

#187–89); and lastly, (6) coworkers putting a noose in a shipping container assigned to her, (*id.* at #158–65).

Take them in that order. The only "evidence" that Heard offers that a coworker drugged her tea is that, half-an-hour after drinking her tea one day, she claims she began to feel "intoxicated." (*Id.* at #200–02). She concedes she did not witness anyone putting something in her tea, did not visit a doctor to confirm that she had been drugged, did not test the tea for the presence of any foreign substances, or otherwise take any additional steps to substantiate that her tea was drugged. (*Id.*). She just asserts that was the case. But her speculation is simply not enough. *Sperber v. Nicholson*, 342 F. App'x 131, 132 (6th Cir. 2009) ("[Plaintiff's] prima facie case thus relies on his own self-serving innuendo and speculation, which does not suffice to survive summary judgment.").

Move next to her allegation that a coworker directed a racial slur in sign language at her. That admittedly sounds bad. But Heard concedes that neither she nor the coworker even *know* sign language. (Doc. 36-3, #211–13). She merely speculates that his hand gesture was directed at her and was meant as a sign in sign language, and then she claims that his gesture matched the ASL sign for a racial slur when she later searched signs for racial slurs on Google. (*Id.*). Moreover, while Heard claimed at her deposition that there is video footage of the incident, she did not use discovery to obtain that alleged footage. (*Id.* at #213–14). So, even assuming that footage exists, it is not part of the record. Once again, her account is entirely too speculative at this stage.

Third, Heard claims her coworkers sprayed her with deer "estrus," typically called deer spray, creating a bad smell. But, again, she admits she never saw anyone spray her or ever even saw a bottle of deer spray in the building. (*Id.* at #205–06). And the only reason she believes that co-workers sprayed her is that she was familiar with the odor of deer spray, as her father hunts, and she noticed that aroma after coworkers walked by her "chuckling." (*Id.* at #204–05).

Fourth, Heard claims two coworkers harassed her by following her from work to a hotel where she had been living. (*Id.* at #217–19, 222–23). She says she saw a silver Hyundai Sonata behind her speed out of the parking lot at the hotel. (*Id.* at #220). She thought this was suspicious, so she noted the vehicle's license plate number. (*Id.* at #219–21). Later at work, she observed a coworker get out of the same car. (*Id.*). From that testimony, a jury admittedly could conclude that the event occurred. But that is not enough; a jury must also conclude that the event reflected discriminatory animus. That is a problem here, as Heard herself provides a non-harassment-based explanation for her coworker's presence at the hotel—the coworker's mother obtained a job in housekeeping there shortly after. (*Id.* at #221). In short, absent something more, the record does not support a reasonable inference that this incident reflected discrimination.

Fifth, a coworker allegedly made derogatory comments regarding her sex and sexuality one time. (*Id.* at #187–89). Again, Heard offers no witnesses, statements, or other evidence to support her claim that this happened, despite asserting at her deposition that other coworkers observed the conversation. (*Id.*). But as to this

15

incident, her own testimony again suffices to create a genuine dispute as to whether it occurred. After all, she asserts in a sworn statement that she heard the co-worker make disparaging remarks. To be sure, a jury may find that testimony lacks credibility, but it could also choose to credit her account. The problem she faces, though, is that, even assuming that these allegations are true, an isolated incident is not enough to support a prima facie case for a hostile work environment. *Faragher*, 524 U.S. at 788. And without more, this is just one incident (or even considered with the above, is only two incidents).

That leaves the sixth, and perhaps most significant, example Heard offers. She claims someone deliberately left a noose in the corner of a shipping container meant as a threat to her and her son's lives. (Doc. 36-3, #158–65). Here, unlike her other claims, Heard has evidence beyond her own testimony—she presented photos of the alleged "noose." (Doc. 39-4, #343). The problem, though, is that the photos simply do not show a noose. (*Id.*). True, the photos show a rope that is securing a piece of equipment (the "air horns") to the side of the container. (*Id.*). And that rope is tied around the generally-cylindrically-shaped tool to suspend it above the ground, so the tool is indeed hanging. But no reasonable finder of fact could conclude that the rope is a noose. Admittedly, there is some dispute over whether the depicted method of securing the air horn in the shipping container is the standard procedure for doing so. (Doc. 36, #102–03; Doc. 36-3, #164). But in the Court's view, the rope is clearly arranged as it is for the purpose of doing just that—securing a tool. And further highlighting the problem with this evidence, Heard fails to create a genuine dispute

as to whether any of her co-workers at the facility even entered the container. Without that, the manner in which the air horns are fastened would have been determined by the crew in the field when they packed the container. And the record contains no reason to believe that they would have had any basis for concluding that Heard, as opposed to one of her coworkers, would be the person to unpack the container. In short, while Heard's photos are evidence, they do not create a genuine dispute of material fact as to whether the method of securing the airhorns gives rise to a reasonable inference of discriminatory intent.

More broadly, as the above recap shows, Heard's "evidence" as to many of these incidents is best described as her own unsupported speculations regarding the impetus behind what just as easily could be benign behavior. Even as to the fourth, fifth, or sixth incidents, where her testimony or other evidence may suffice to create at least a genuine dispute as to whether those incidents occurred, the incidents themselves would not provide a sufficient basis to sustain an employment discrimination claim based on either race or sex. And as Heard failed to provide proof concerning essential elements of her case, the Court can treat "all other facts [as] immaterial." *Celotex*, 477 U.S. at 323.

Moreover, Heard's deposition and her response to Defendant's motion, if anything, simply highlight her lack of evidence. FieldCore, for example, points out in its briefing that its investigation did not substantiate her claims about the six incidents. In response to that, Heard observes that "[t]he failure to substantiate the claim is just admitting there was not enough evidence to support the claim, not that

17

the incidents didn't occur." (Doc. 39, #293–94). But that is precisely the problem here—it is now her burden to provide "enough evidence to support the claim," and she has not done so. (*Id.*). And when directly asked in her deposition if she has any evidence of these wrongdoings beyond her own testimony, she responded: "No. The only evidence I have is my personal experience." (Doc. 36-3, #238).

The underlying explanation for Heard's lack of evidence is perhaps equally troubling. As FieldCore noted, Heard "deposed no witnesses, collected no statements, and requested no documents from FieldCore or any third party" within the appropriate discovery window.[9] (Doc. 36, #107). Although the Court must draw all inferences in favor of the non-moving party, "[u]nsubstantiated, self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted." *Chambers v. Hardy*, No. 19-5201, 2019 WL 8138590, at *4 (6th Cir. Oct. 30, 2019) (citing *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018) (collecting cases)). Considering the lack of evidence supporting her claims and that isolated incidents are insufficient, Heard fails to create a genuine dispute as to whether she suffered a hostile work environment. Therefore, she cannot rely on that theory to provide the necessary adverse employment action.

---

[9] The Court recognizes that Heard made a later attempt at discovery, (Doc. 27), but the Court denied her attempt to reopen discovery because she filed it some five months after discovery closed and had not even tried to request information during the appropriate time, (Doc. 31).

**2. Because Heard Cannot Establish a Hostile Work Environment Claim, Her Constructive Discharge Claim Necessarily Fails.**

Separately, Heard could be understood as alleging that FieldCore constructively discharged her, essentially that the company created a hostile work environment that was so severe she was forced to resign. Just as with the hostile-work-environment claim, this theory offers her a plausible legal hook—a constructive discharge will be treated the same as an actual discharge for purposes of Title VII, so it qualifies as an adverse employment action. *Green*, 578 U.S. at 555. But again, the problem is that she has not created a genuine dispute as to whether a constructive discharge occurred.

Generally, for a plaintiff to establish a constructive-discharge claim, she must prove that "the employer [] deliberately create[d] intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999). In a compound hostile-environment/constructive-discharge claim (i.e., where a plaintiff is claiming that both occurred), this is a higher standard than a hostile-work-environment claim alone; "something more" is required. *Pa. State Police v. Suders*, 542 U.S. 129, 146–47 (2004). The effect of this higher standard is that failure to establish a prima facie case of a hostile work environment necessarily means a compound constructive-discharge claim must fail, too. *Brown v. Metro. Gov't of Nashville & Davidson Cnty.*, 722 F. App'x 520, 525 (6th Cir. 2018); *McDaniel v. Wilkie*, No. 19-3304, 2020 WL 1066007, at *4 (6th Cir. Jan. 31, 2020) ("To the extent that [plaintiff's] constructive-discharge claim relied on the [defendant] having a

hostile work environment, because there is no genuine dispute that she failed to establish the latter claim, the same holds for the former.").

Heard's constructive-discharge claim necessarily fails then because she has not created a genuine dispute on her hostile-work-environment theory. *See supra* Part A.1. The six incidents she alleges are either speculative or isolated incidents that are insufficient, alone or in combination (as to those where she created a genuine dispute as to occurrence), to establish that discriminatory working conditions were "sufficiently severe or pervasive," for purposes of the hostile-work-environment claim, or "intolerable," for purposes of the constructive-discharge claim. Therefore, Heard does not create a genuine dispute as to whether she was constructively discharged.

Beyond her failure to establish intolerable working conditions, Heard also fails to adequately assert that *FieldCore* itself (as opposed to, say, various co-workers) acted deliberately with the intent to force her to quit. *Moore*, 171 F.3d at 1080. Indeed, far from suggesting that FieldCore acted with a nefarious intent, the record actually shows that FieldCore tried to get her to stay on the job. After Heard found what she describes as a noose, she opted to use her three available vacation days and to return to work on Monday, April 25. (Doc. 39-1, #311–12). When she did not come to work that Monday, her supervisor reached out to see if she was planning to return. (*Id.* at #313). That was followed by a series of calls and emails, culminating with Heard emailing, on Friday, April 29, that she still did not feel safe and "will not be back on Monday or any other day." (*Id.* at #314). In sum, the emails Heard provided show FieldCore reaching out repeatedly, via email, calls, and texts, in an effort to discuss

20

its investigation into the noose and other incidents, to offer any support, and to see if Heard planned to return to work. (*Id.* at #311, 313–14). The only reasonable conclusion that the record supports is that Heard decided to quit on her own, which does not constitute a constructive discharge.

Because Heard cannot establish she suffered from a hostile work environment or that FieldCore constructively discharged her, she did not establish that FieldCore took an adverse employment action against her. Thus, Heard cannot establish a discrimination claim based on either race or sex.

### B. FieldCore Is Entitled to Summary Judgment on Heard's Retaliation Claim as Well.

Heard also asserts a claim for retaliation. Title VII prohibits employers from retaliating against employees who oppose an unlawful employment practice. 42 U.S.C. § 2000e-3(a). Like other Title VII claims, a plaintiff can establish a retaliation claim either by direct or circumstantial evidence. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Again, though, under either, Heard must show that the defendant "took an action that was 'materially adverse' to the plaintiff." *Id.* (citing *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)) (identifying need for "materially adverse" action for circumstantial evidence claims); *Thibert v. City of Oregon*, 724 F. Supp. 2d 830, 838 (N.D. Ohio 2010) (same as to direct evidence claims).

Here, all agree that Heard engaged in conduct that Title VII protects. Specifically, she reported the earlier incidents (someone drugging her tea, the sign language, negative comments regarding her sexuality) to FieldCore. So, if the record creates a genuine dispute as to whether FieldCore retaliated, Heard would be entitled

to present her case to the jury. The problem again is her inability to identify a materially adverse action that would count as retaliation.

Heard again pursues two separate avenues to proving the requisite materially adverse action. First, she claims that the noose incident evinces FieldCore retaliating against her for reporting the earlier incidents. But, as discussed above, *supra* Part A.1, Heard simply has not created a genuine dispute that there was an incident directed at her involving a "noose." While she submitted photos of the alleged noose, (Doc. 39-4, #343), the setup simply depicts a piece of equipment secured by a rope in a fashion chosen by field workers who would not even know that Heard would be assigned to unpack the crate. So Heard cannot rely on the noose incident to establish a materially adverse action for the third element of her prima facie case.

Second, Heard points to her constructive discharge as retaliation for reporting these incidents and specifically the final noose claim. (Doc. 39, #309). But as discussed in Part A.2, Heard in fact resigned. She emailed that she would "not be back on Monday or any other day." (Doc. 39-1, #314). And against that backdrop, she failed to create a question for the jury as to whether conditions at FieldCore were "intolerable," or whether FieldCore acted with the intent to force her to quit. Rather, the evidence Heard provides shows FieldCore attempting to retain Heard and discuss its investigation into the incidents with her. (*Id.* at #313–314). Accordingly, for largely the same reasons that her discrimination claims fail, so too does her retaliation claim.

## CONCLUSION

Because Heard has not provided sufficient evidence to establish a prima facie case for discrimination or retaliation, the Court **GRANTS** FieldCore's Motion for Summary Judgment (Doc. 36). The Court therefore **DIRECTS** the Clerk to enter judgment and **TERMINATE** this case on its docket.

**SO ORDERED.**

September 15, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**